HERNESS, RESPONDENT, v. McCANN ET AL., APPELLANTS.

(No. 6,771.)

(Submitted May 18, 1931.   Decided May 25, 1931.)

[300 Pac. 257.]

*Messrs. Maddox & Church,* for Appellants, submitted a brief; *Mr. Warren Toole,* of Counsel, argued the cause orally.

*Mr. W. L. Rose* and *Mr. Paul Babcock,* for Respondent, submitted a brief; *Mr. Rose* argued the cause orally.

98

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendants, James A. McCann and Florian B. McCann, have appealed from a judgment in favor of plaintiff, Louis Herness, entered in an action for damages for destruction of crops by trespassing cattle. The complaint included Eva L. McCann, wife of James A. McCann, as a party defendant with her husband and son, but at the trial the action was dismissed as to her, by reason of the fact that allegations of conspiracy were not sustained.

The complaint alleges that the defendants wilfully and maliciously drove cattle, in which they were jointly interested, upon the lands of plaintiff where they so damaged crops of wheat, oats, barley and hay that plaintiff suffered shortages in the crops thereafter harvested. Plaintiff prayed for $1,500 actual, and $500 exemplary, damages. Defendants answered by general denial. On a trial a jury awarded plaintiff actual damages in the sum of $1,296.90 and $275 exemplary damages, and judgment was entered accordingly. Defendants moved for a new trial, which was denied.

The record discloses substantial evidence on behalf of the plaintiff to the following effect: Plaintiff was a lessee of the Diamond ranch, situated immediately north of the Missouri River, near Culbertson in northeastern Montana, and in 1929

for the first time cropped it. This was an old ranch and had theretofore been inclosed by a barbed-wire fence and cropped. Along the river at the southern end of the ranch, an almost perpendicular bluff extended for a distance of approximately half a mile and was utilized as a part of the inclosure. In the spring of 1929 portions of the fence were down and an opening existed next the bluff, and cattle came through and grazed upon plaintiff's land; but in April the fence was repaired throughout and a supplemental fence, a few rods in length, extended from the north end of the west fence to or near the bluff. Thereafter no cattle got through, except as they entered through a gate erected near the bluff or through a cut in the fence, or were driven upon plaintiff's land.

Early in August, 1929, plaintiff's crops were matured and a good yield was assured, when plaintiff discovered the McCann cattle, numbering approximately 150 head, ranging over the fields; his son rounded up and drove out as many as he could, but owing to a heavy growth of willow brush and vines near the river it was impossible to get them all, and those left later returned to the grain fields. Driving these cattle to the gate, the young man found it open and, after running the cattle he had secured out of the gate, he wired it up and drove staples over the wires, preventing its again being opened. Two days later the entire herd of cattle were back in the grain and hay-fields and, again running out as many as could be kept out of the brush, plaintiff discovered that the fence had been cut away between the gate and the bluff. It was repaired and plaintiff set his son and another young man by the name of Cotton to watch the fence in an effort to discover who was turning the cattle into the fields. The young men camped in the brush, hidden from view, for a period of a week. On August 12, or three days after the fence was cut, the watchers saw Florian McCann, with his brother and a third man in the employ of James A. McCann, drive the entire herd of cattle along the fence and force them to crowd their way around the fence next to the bluff, from which point they ran to the river and thence to the plaintiff's fields.

Several witnesses testified that James A. McCann was working with and around the cattle to the west of plaintiff's fence, almost daily during the period covered by the testimony, and, as connecting him with the unlawful acts of his sons and employee, plaintiff's son testified: "I saw Mr. James McCann at that gate shortly before it was cut and Mr. McCann's cattle went into the pasture immediately after it was cut. I also saw J. A. McCann with the stock at the time they went around the end of the fence into the field."

Cotton testified that on or about August 12, while the cattle were all outside the fence, James A. McCann visited the fence, with others, and appeared to be looking it over, at which time his daughter said to him, "This fence is on the Diamond all right." Thereafter plaintiff had the fence extended up the bluff so that stock could not be forced through again.

On August 15 Cotton and young Herness saw James A. McCann and a "government" man, in a car, and Florian McCann, on horseback, come to the gate; they examined it and the fence to the bluff, remaining about 10 minutes talking; the cattle were all about the fence. McCann and the stranger got into the car and drove away, whereupon Florian McCann cut all of the wires on the fence and the cattle rushed through, going to the river and thereafter to the grain fields.

The cattle had, prior to the repair of the fence in the spring, been wont to go to the river along the bluff for water; thereafter McCann relied upon a "dam in a coulee" on his grazing land for water; the cattle still hung along the fence in an effort to get to the river but never attempted to pass along the bluff until forced to do so as above related. In August the water in the coulee reservoir entirely dried up, and it was said that, prior to the last attack upon the fence, the cattle had been without water for two or three days. After the gate was again wired up, and Florian McCann had seen that the two young men had observed his action in cutting the fence, the cattle were on August 16 moved to another locality where, apparently, they continued to trespass, as two other actions were com-

menced against defendants on like grounds, about the time this action was brought.

Plaintiff admitted that he did not have a legal fence, and there is a suggestion in the record that the fence against the bluff was not on plaintiff's land, but no direct evidence on the subject.

Most of the testimony on behalf of plaintiff is contradicted, but the jurors were at liberty to believe it, and disbelieve the contradictory testimony.

1. It is contended by defendants that James A. McCann ▮▮ cannot be held liable, as plaintiff failed to prove that Florian B. McCann acted with his knowledge or authority, or under his direction.

In support of the judgment, on this contention, plaintiff relies upon the pronouncement of this court in *Chilcott* v. *Rea*, 52 Mont. 134, 155 Pac. 1114, 1115, that: "Where animals are held in herd, their movements being directed or controlled by their owner or his employees who know, or are chargeable with knowledge of, the boundaries of adjacent private property, and they invade such property through either the wilful act or the negligence of their owner or his employees, such invasion is an actionable trespass." This is an amplification of the rule theretofore announced in *Monroe* v. *Cannon*, 24 Mont. 316, 81 Am. St. Rep. 439, 61 Pac. 863, *Musselshell Cattle Co.* v. *Woolfolk*, 34 Mont, 126, 85 Pac. 874, and *Herrin* v. *Sieben*, 46 Mont. 226, 127. Pac. 323, 327, wherein the conditions prevailing made it unnecessary to consider the question of responsibility of the owner for damages caused by the negligence of his employees; but in *Herrin* v. *Sieben*, Mr. Chief Justice Brantly, speaking for the court, took occasion to say of *Monroe* v. *Cannon*: "This decision in effect declared that the purpose of the legislation [legal fence law] was to condone trespasses committed by animals lawfully running at large, and that common-law rule is left otherwise unchanged." Under the common-law rule, every owner of animals is liable "if, by his negligent keeping, they stray upon the lands of another" (2 Bl. Comm. 211, 212); and in *Chilcott* v. *Rea*, the doctrine of

*respondeat superior* is applied to such trespass, as it was in the former decisions involving wilful trespass.

In *Schreiner* v. *Deep Creek Stock Assn.*, 68 Mont. 104, 217 Pac. 663, 666, this court announced the rule to be that "under the 'legal fence law' privately owned premises must be fenced as required by statute in order to enable the owner to maintain an action for damages for trespass by the livestock of another unless (1) the trespassing animal is prohibited by statute from running at large, or (2) the trespassing animal has been placed or caused to be placed thereon by the owner of the animal with knowledge that the land is not open public domain." This statement does not include the element of negligence nor the rule of *respondeat superior* found in *Chilcott* v. *Rea;* it was sufficient in disposition of the case in which it was used, but is incomplete as a statement of the general rule. The rule announced in *Chilcott* v. *Rea* is the correct one and is hereby approved.

However, presumably in view of the rule announced in the *Schreiner Case*, the court instructed the jury that James A. McCann could not be held responsible for the acts of Florian B. McCann "unless under the instructions or directions of said James A. McCann, or with his prior knowledge and consent." This instruction, right or wrong, became the law of the case and the showing made must now be judged by its limitations.

Considerable of defendants' brief is devoted to the question of a parent's responsibility for the torts of his child and the law of master and servant; under the instruction given these questions are immaterial. The question is: Does the record warrant a finding that the acts of young McCann were committed under the instruction, direction, or with the prior knowledge and consent, of his father?

The record is replete with evidence tending to show that James A. McCann and his sons were jointly interested in running cattle and that, during the period covered by the several trespasses, both defendants were riding through and tending the cattle almost daily; that the cattle were uneasy on

account of water shortage and hung along plaintiff's fence which separated them from the river. There is a clear inference to be drawn from the testimony that James A. McCann resented the fencing of his cattle from the river and entertained doubts as to plaintiff's right to do so. The circumstances surrounding each of the entries of the cattle into plaintiff's fields give rise to the conclusion that on no occasion did they get through the fence without human aid. There is testimony to the effect that James A. McCann was present at the time the cattle were crowded past the fence where it ended at the bluff; and, finally, the circumstances surrounding the cutting of the fence on August 15, as related above, would indicate to a man of average intelligence that the conversation had, concerned the right of plaintiff to maintain the fence and the right of defendants to destroy it.

As in other cases, the facts here warranting a recovery could be established by circumstantial evidence and, in a civil case, such evidence need only preponderate in favor of the findings of the jury. The circumstances shown amply warranted the jury in finding that James A. McCann either instructed his son to cut the fence, or had full knowledge that he was about to do so, in order that their cattle might, as they did, rush through to the much needed water.

2. Defendants contend that they are not responsible, as a ▮▮ portion of the damage done was by trespassing cattle which entered without their fault, between the 7th and 15th of August, contending that the cattle got in "when the fences were down," and quote the plaintiff as saying, with reference to this period, "There was nothing to prevent cattle from going in there whether they were driven or not." While there is some confusion manifest in the record, it is clear that the period "when the fences were down" ended in April when plaintiff repaired his entire fence and made it cattle-proof; that the quoted statement referred to that period; and that, subsequent to August 1, all cattle which went through the fence did so because someone either opened the gate, cut the fence, or crowded the cattle around the end of the fence at the bluff.

It is true that plaintiff admitted that "at that time the fence was not fixed in such manner that stock could not get around the end of the gate between this last post and the bluff," but there is positive testimony that no cattle attempted to do so until they were driven and crowded against the bluff and forced to make a passage.

3. It is asserted that plaintiff failed to prove damages, in that he did not comply with the accepted rule as to the measure of damages for the destruction of a standing crop laid down in *Raas* v. *Sharp*, 46 Mont. 474, 128 Pac. 594, 595, to-wit, "The net loss is all that can be recovered, viz., the market value of the crop alleged to be lost, over the cost of producing, harvesting, and marketing," inasmuch as he failed to prove the cost of producing the crops alleged to have been destroyed, or, in this instance, damaged to the extent of a reduction in yield.

Plaintiff proved that, at the time of the trespass, his crops were matured and ready for harvest, and it would seem that, as on a sale of the grain, plaintiff would have received the cost of producing as a part of the market price, defendants in this case would not be entitled to a deduction of that cost. However, the jury was governed by the instructions of the court. The court did not instruct in conformity with the rule above quoted; instead, the judge instructed the jury that "the measure of damages for the destruction of wheat, oats, barley and hay * * * is the value of such wheat, oats, barley and hay in the condition the same was at the time and place of the destruction." Again, whether right or wrong, this instruction became the law of the case, and, if the finding of the jury is justified by the evidence on this subject, the judgment must stand.

It is conceded that plaintiff sufficiently proved the market value of the hay. As to the grain, plaintiff testified that the cost of harvesting his grain in its damaged condition was the same as it would have been had the cattle not tramped and consumed a part thereof; this testimony was not contradicted and the element of cost of harvesting was eliminated. He

proved the cost of marketing grain and the shortage he suffered, thus bringing his proof within the measure of damages announced by the trial court. However, as to the market value, plaintiff's testimony is only as to dollars and cents, without stating to what quantity of grain the figures applied. Counsel for defendants contend that in this his proof failed, as it cannot be ascertained from the evidence whether the price applied to bushels or hundredweight. This contention is hypercritical; all reference to the grain was made as to the number of bushels lost, the number of bushels threshed, and the number of bushels marketed, etc. It is clear that when plaintiff referred to the market price of wheat on a certain day as "$1.16," he stated the market price per bushel just as the price is used in daily market quotations.

Other questions raised have been considered and found lacking in substance. The proof was sufficient to warrant the verdict and judgment.

Judgment affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.